STATE of Minnesota, Respondent,

v.

Ralph A. BEARD, Appellant.

No. C4–85–201.

Court of Appeals of Minnesota.

Jan. 21, 1986.

Review Denied March 3, 1986.

Hubert H. Humphrey, III, Atty. Gen., James B. Early, Asst. Atty. Gen., St. Paul, Ann Carrott, Douglas Co. Atty., Alexandria, for respondent.

C. Paul Jones, State Public Defender, Ann Remington, Asst. State Public Defender, Minneapolis, for appellant.

Heard, considered and decided by LESLIE; P.J., and WOZNIAK and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

Appellant Ralph Beard appeals from his convictions of two counts of first degree criminal sexual conduct in violation of Minn.Stat. §§ 609.342(c), .342(e)(i) (1984), two counts of second degree criminal sexual conduct in violation of Minn.Stat. §§ 609.343(c), .343(e)(i) (1984), kidnapping in violation of Minn.Stat. § 609.25, subd. 1 (1984), and false imprisonment in violation of Minn.Stat. § 609.255, subd. 2 (1984). The trial court vacated the two convictions for second degree criminal sexual conduct.

Beard was sentenced to concurrent terms of eighty-one months for the convictions of kidnapping and criminal sexual conduct in the first degree (Minn.Stat. § 609.342(c)). We affirm in part and vacate in part.

## FACTS

On the evening of April 7, 1984, thirteen-year-old T.G. was staying with neighbors who lived on the outskirts of Alexandria, Minnesota. She testified that, at around 9:00 p.m., she left the house to go jogging. This was not unusual for her since she was a member of her school track team. She was jogging on a semi-deserted highway, approaching a bridge over Interstate 94, when she noticed a tractor trailer approaching her from behind. A few minutes later, the truck driver, who had apparently caught up with her on foot, grabbed her from behind. At trial, T.G. identified Ralph Beard as the person who grabbed her.

T.G. testified that Beard told her to go to the truck which was parked down the road. When T.G. did not respond, Beard opened his jacket and revealed a pistol pushed partly into his pants. After seeing the pistol, T.G. went to the truck and Beard followed directly behind her. When Beard told her to get in the cab of the truck, T.G. resisted. Beard then told her in a rough voice to get in and T.G. complied. When they were both inside, Beard told her to get into the sleeper compartment behind the front seat. T.G. got in the back seat and Beard closed the curtains behind the front seat and began to drive.

T.G. testified that Beard drove for about ten to fifteen minutes. T.G. could not tell where Beard finally stopped the truck. After stopping, Beard told T.G. to take off her clothes.

T.G. testified that after she had removed her clothes, Beard removed his and climbed back into the sleeper area. He pulled her left arm forcing her to lie on her back and proceeded to sexually assault her. T.G. testified in detail about the sexual assault which included intercourse.

T.G. testified that she did not talk to Beard and that Beard said only a few words to her during the assault. After the assault, Beard told T.G. about his ex-wife, his daughter, his ranch in Montana and his trucking job. After talking for a few minutes, Beard threw T.G.'s clothes at her and told her to get dressed. He then closed the curtains and began to drive.

T.G. testified that, about five to ten minutes later, Beard stopped the truck and opened the curtains. When Beard told her to get out, she climbed out through the passenger door. He gave her some change and told her to find someone to take her home. Beard then drove off toward the interstate highway, leaving T.G. near a mall in Alexandria.

T.G. accurately described Beard and the interior of his cab in her statement to the police and in her testimony at trial.

When Beard drove off, T.G. went to an all-night grocery store and called a friend. While waiting for her friend, T.G. went into a restroom and removed her tampon which had been pushed up inside her and cleaned herself up.

Her friend picked her up at about 10:20 p.m. Her friend asked her what happened. T.G. told him that she was raped. Her friend asked if she was sure. She responded that she was sure. She then asked him to take her home but the friend insisted upon taking her to the Alexandria police station.

Soon after their arrival at the police station, Officer Keith Winger questioned T.G. Winger testified that T.G. was very sure of the facts of the assault as she related the events to him. Winger then took her to the hospital.

At approximately 12:30 a.m., Dr. Peter Geiser did a standard sexual assault exam of T.G. Dr. Geiser testified that T.G. told him that her left shoulder was sore but she did not complain of any other discomfort. Geiser did not find any bruises, bumps or lacerations on her body. He confirmed that she was menstruating at the time.

From T.G.'s description of the truck, Officer Winger was able to locate Beard as a driver for Dakota Bake-N-Serv Inc. Beard was subsequently arrested by the Douglas County Sheriff on April 20, 1984, in Columbus, Wisconsin. He was brought to the Douglas County Jail on April 29, 1984, where he remained incarcerated until trial.

The State called other witnesses to support T.G.'s testimony. A local farmer testified that he saw a tractor trailer parked along the road about one-half mile from his farm sometime around April 7, 1984. He stated that this was unusual because there are seasonal frost laws which prohibit heavy vehicles from using the road. Linda Hoaglund, who was home on April 7, 1984, testified that T.G. left their house to go jogging at 9:00 p.m.

Beard testified that on April 7, 1984, he was on a return trip to Columbus, Wisconsin after making a run to Jamestown, North Dakota. He arrived at the Skelly Truck Stop in Alexandria around 9:00 p.m. that day, and while there T.G. sat down on the counter stool next to him. They conversed about Beard's family and T.G.'s interest in sports.

Beard testified that he was preparing to leave when T.G. told him she had never seen the inside of a truck. They then went out to the truck and eventually had intercourse. After they finished, T.G. asked if she could have some change for a phone call. She left the truck and Beard did not see her again. Beard testified at trial that he then proceeded eastbound on Highway 94. Detective Jerry Werner testified that Beard told him he went back into the restaurant to eat before he started driving again.

The State offered evidence to discredit Beard's testimony. When Beard was first arrested on April 20, he denied having intercourse with anyone in Alexandria. Later that same day, he admitted that he had intercourse with T.G. Detective Werner testified that he spoke with the waitress who was on duty at the restaurant on the evening of April 7. He showed her photographs of Beard and T.G. and she recognized neither of them.

## ISSUES

1. Is the evidence sufficient to sustain appellant's convictions?

2. Did the trial court err in admitting evidence of a lineup identification?

3. Did the trial court err in admitting evidence of statements that appellant made to a detective without the assistance of counsel?

4. Did the trial court err in admitting evidence of statements that appellant made to another inmate?

5. Did the trial court err in not vacating as included offenses appellant's convictions of first degree criminal sexual conduct in violation of Minn.Stat. § 609.342(e)(i) and of false imprisonment?

6. Did the trial court err in determining that appellant's prior convictions of theft and transporting a stolen motor vehicle interstate were not part of a single behavioral incident?

## ANALYSIS

### I.

Beard argues that the evidence is insufficient to support his convictions. Beard asserts that T.G.'s testimony was so contradictory, incredible and uncorroborated that it was unreasonable for the jury to believe her. He claims that the sexual intercourse was consensual.

Beard cites a number of minor inconsistencies between T.G.'s testimony at trial and her statements to the police and her friends after the assault. In support of his consent defense, Beard claims that the friend who picked T.G. up initially doubted whether she had been assaulted because the friend asked her if she was certain about the rape. In addition, T.G. herself testified that she did not want to go to the police. Beard argues that this evidence, combined with the inconsistencies between T.G.'s testimony at trial and her previous

statements, indicates that T.G. consented to the intercourse and later had regrets.

We will affirm a jury's guilty verdict if the jury, acting with due regard to the presumption of innocence and the need for proof beyond a reasonable doubt, could reasonably have found that the defendant was guilty of the offenses charged. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). In determining the sufficiency of the evidence, we consider the evidence in the light most favorable to the State. *State v. Lloyd,* 345 N.W.2d 240, 244 (Minn.1984). In addition, resolving conflicting testimony is the exclusive function of the jury because it has the opportunity to observe witnesses' demeanor and to weigh their credibility. *Id.* at 245. On review, this court will assume that the jury believed the State's witnesses and disbelieved any contradictory testimony. *Merrill,* 274 N.W.2d at 111.

■ The State's witnesses provided a detailed account of the events of April 7. Assuming the jury believed these witnesses, there is sufficient evidence to sustain Beard's convictions.

We also conclude that the minor inconsistencies between T.G.'s testimony and her previous statements are not grounds for reversing the jury's guilty verdict. This case is similar to *State v. Stufflebean,* 329 N.W.2d 314 (Minn.1983). In *Stufflebean,* there were inconsistencies in the sexual assault victim's testimony, however, the supreme court considered the trauma of the incident and found that the victim's testimony was consistent as a whole and did not evince an attempt to commit perjury. *Id.* at 319.

Beard also argues that T.G.'s testimony is uncorroborated and therefore cannot support his convictions. We reject Beard's argument. Minn.Stat. § 609.347, subd. 1 (1984) specifically provides that a sexual assault complainant's testimony need not be corroborated.

In conclusion, there is sufficient evidence to sustain Beard's convictions and T.G.'s testimony, taken as a whole, was consistent and credible. We find no basis upon which to disregard the jury's verdict.

## II.

■ Beard argues that the trial court erred in admitting identification evidence that resulted from an impermissibly suggestive lineup. There was no identification issue in this case because Beard admitted that he had intercourse with T.G. Thus, any error that the trial court may have committed in admitting evidence of T.G.'s identification of Beard in a lineup was harmless beyond a reasonable doubt. *See State v. Fossen,* 282 N.W.2d 496, 511 n. 12 (Minn.1979) (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

## III.

Beard claims that the trial court erred in admitting statements he made during two separate conversations with Detective Werner. Beard asserts that he was denied his constitutional right to have an attorney present during the questioning.

### A. Conversation of April 20, 1984

■ On the night Beard was arrested, he was read his Miranda rights and consented to questioning by Detective Werner without assistance of counsel. At some point in the conversation, Beard may have made an equivocal request for an attorney. Beard has failed to show, however, that any statements made after that point in the conversation were admitted into evidence at trial. Since no statements which Beard made after his claimed request for an attorney were admitted into evidence, there can be no error.

### B. Conversation of April 29, 1984

When Beard returned to Minnesota on April 29, 1984, he gave another statement to Detective Werner. The transcript of the conversation begins with the following comment by Werner:

This is a statement taken from Ralph Beard. It is now 6:50 on April 29, 1984. Ralph Beard and Jerry Werner are

present. I have advised Ralph Beard of his rights, which he understood. We are going to talk about what we had talked about while we were in Wisconsin and a couple of things in addition to that.

Beard claims that all his statements from this conversation are inadmissible because there is no written record that he waived his rights.

■■■ In the ordinary case, if the prosecutor shows that the Miranda warning was given and that the defendant stated he understood his rights and then gave a statement, the state will have met its burden of proof unless there is other evidence indicating that there was no knowing, intelligent and voluntary waiver. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). In this case, the State has claimed there was a warning and a waiver. Beard has never disputed the State's claim. There is no evidence that Beard's waiver was not knowing, intelligent and voluntary. Further, Beard admitted at the omnibus hearing that he was read his rights. The trial court did not err in admitting into evidence Beard's statements made during the April 29 conversation.

### IV.

Beard argues that certain statements elicited by his fellow inmate James Putnam were inadmissible.

While Beard was incarcerated prior to trial, Douglas County Sheriff Terry Eilers was informed that Beard was making threats against T.G. James Putnam, an inmate in the cell block with Beard, subsequently told Eilers that Beard had offered him either $12,000 or $18,000 to kill T.G. Eilers then asked Putnam to try to get more information from Beard about the threats.

Putnam later reported further conversations with Beard. Putnam told Eilers that Beard had offered him $800 cash and a $500 car if he would kill T.G. Putnam testified about all these conversations at trial. In addition, Putnam testified that Beard told him to use a gun to kill T.G.

Beard objects only to Putnam's testimony about the conversations that they had after Eilers asked Putnam if he could get more information from Beard. Beard's objection is based only upon his claim that his constitutional right to counsel was violated.

■■■ Any error committed in admitting evidence of Beard's statements to Putnam that Beard made after Putnam had talked to Eilers was harmless beyond a reasonable doubt. *Fossen*, 282 N.W.2d at 511 n. 12. No objection was made to Putnam's testimony about Beard's initial threats. In light of Putnam's already-admitted testimony, we do not believe that Beard has carried his burden of showing that Putnam's testimony about the subsequent threat prejudiced him. *See State v. Darveaux*, 318 N.W.2d 44, 48 (Minn.1982).

### V.

■■■ Minn.Stat. § 609.04 (1984) provides that a person may be convicted of either the crime charged or an included offense, but not both. Beard was convicted of criminal sexual conduct in the first degree, Minn.Stat. § 609.342(e)(i) (penetration accomplished by force or coercion accompanied by personal injury) and criminal sexual conduct in the first degree, Minn.Stat. § 609.342(c) (penetration accomplished when complainant had a reasonable fear of imminent great bodily harm). Although the statute does not strictly define either of these sexual convictions as an included offense of the other, the supreme court in *State v. Bowser*, 307 N.W.2d 778, 779 (Minn.1981) (citing Minn.Stat. § 609.04), held that a defendant can be convicted of only one of these two offenses. Beard requests and the State agrees that Beard's conviction under subsection (e)(i) should be vacated.

■■■ Likewise, Beard requests and the State agrees that the conviction of false imprisonment should be vacated as a lesser included offense of kidnapping, pursuant to Minn.Stat. § 609.04, subd. 1(4) (1984). *See State v. Keenan*, 289 Minn. 313, 317, 184 N.W.2d 410, 412 (1971) (false imprisonment is a lesser included offense of the crime of

kidnapping). We agree that both of these convictions should be vacated.

## VI.

Beard asserts that the trial court improperly calculated his criminal history score.

The trial court assigned Beard three criminal history points for the following convictions:

1. 1972 Georgia conviction of theft by taking;
2. 1974 federal conviction of interstate transportation of a stolen motor vehicle; and
3. 1978 Alabama conviction of obtaining merchandise by false pretenses.

The trial court ruled that Beard's convictions of interstate transportation of a stolen motor vehicle and theft by taking resulted from separate behavioral incidents and, as a result, it counted the convictions as two points. Beard asserts that these two convictions should account for only one point because they arose from a single behavioral incident. We disagree.

The facts of the federal and Georgia convictions are as follows: Beard had permission to drive a tractor trailer from South Carolina to a destination in Alabama. Instead, he illegally diverted the truck to transport stolen boats. On May 5, 1972, Beard was arrested by federal agents in Alabama for interstate transportation of a stolen motor vehicle. Beard testified that his main reason for taking the truck was to transport the stolen boats. Beard was released on bond and was arrested by Georgia officials on May 20, 1972. According to Beard, he was in one of the stolen boats attempting to leave the country when he was apprehended in Georgia. Beard was convicted under Georgia law for stealing the boat. He was later convicted under federal law for transporting the stolen tractor trailer interstate.

Section II.B.03. of the Minnesota Sentencing Guidelines directs that a criminal offender is assigned one point for every felony conviction for which a felony sentence was stayed or imposed before the current sentencing. Comment II.B.101. provides, in part, that:

> In cases of multiple offenses occurring in a single behavioral incident in which state law prohibits the offender being sentenced on more than one offense, the offender would receive one point.

The Guidelines are consistent with Minn. Stat. § 609.035 (1984) which prohibits multiple sentences for multiple offenses committed in a single behavioral incident.

 To determine whether multiple offenses were committed in a single behavioral incident, the court "must ascertain whether the underlying conduct was unitary or divisible." *Langdon v. State*, 375 N.W.2d 474, 476 (Minn.1985). When intent is an element of the offenses, the court must focus on such factors as time and place, and consider whether the conduct involved was motivated by an effort to obtain a single criminal objective. *State v. Zuehlke*, 320 N.W.2d 79, 82 (Minn.1982). It is the trial court's role to resolve any factual dispute bearing on the defendant's criminal history score. *State v. Olson*, 379 N.W.2d 524, (Minn.1986).

 The record regarding these two convictions is sparse, leaving many unexplained details. There is enough evidence in the record, however, for us to conclude that the trial court did not err in determining that the two convictions arose from separate behavioral incidents.

The arrests for the two offenses occurred fifteen days apart. One arrest occurred in Alabama and the other occurred in Georgia. Even though both offenses involved stolen boats, we do not believe that Beard was trying to obtain a single criminal objective. When he committed the federal offense, he was simply stealing the boats. When he committed the Georgia offense, he was using a stolen boat apparently as a means of escape. The record is clear that Beard's conduct was divisible. Thus, we conclude that the trial court did not err in determining that Beard's actions constituted a divisible course of conduct and therefore accrued three, not two, criminal history points.

## DECISION

Appellant's convictions are supported by sufficient evidence. The trial court did not err in admitting evidence of a lineup identification, Beard's statements to Detective Werner or his statements to a fellow inmate. Nor did the trial court err in calculating appellant's criminal history score.

We direct the trial court to vacate appellant's conviction of first degree criminal sexual conduct in violation of Minn.Stat. § 609.342(e)(i) and his conviction of false imprisonment.

Affirmed in part and vacated in part.